**U.S. DISTRICT COURT FOR THE**
**EASTERN DISTRICT OF PENNSYLVANIA**

DELAWARE RIVERKEEPER
NETWORK AND THE DELAWARE
RIVERKEEPER, MAYA VAN
ROSSUM,

      Plaintiffs,

v.

NATIONAL PARK SERVICE,

      Defendant.

COMPLAINT FOR
DECLARATORY
JUDGMENT

CASE NO. 2:21-cv-2797

**FACTS**
**TINICUM CREEK**

1.      The lower Delaware River, including Tinicum Creek in Tinicum Township, Bucks County, Pennsylvania, was designated as a Wild and Scenic River by Congress under the Wild and Scenic Rivers Act, 16 U.S.C. 1271 *et seq*. including 16 U.S.C. 1276(a) 133 I and 16 U.S.C. 1276 (b)(14).

2.      The values for which Tinicum Creek was designated into the National Wild and Scenic Rivers System under Public Law 106-418 including its Outstandingly Remarkable Values (ORVs) are described in detail in the Lower Delaware River Management Plan (1997), Lower Delaware Wild and Scenic River Study report (1999), and the Delaware River Basin National Wild and Scenic River Values (2012).

3.      Tinicum Creek is also designated as an Exceptional Value stream by the Pennsylvania Department of Environmental Protection (PA DEP).

4.      Exceptional Value is the highest level of anti-degradation protection in Pennsylvania under the Pennsylvania Clean Streams Law.

5.      Tinicum Creek flows for a total of 6.4 miles with an overall elevation drop from 240 feet at the headwaters to an elevation of 100 feet at its confluence with the Delaware River.

6.      Tinicum Creek is located within the Ridge Valley Rural Historic District, a very rural agricultural area of Tinicum Township and Bucks County; the historic district was previously known as the Six Bridges Historic District.

7.      A bridge carrying Headquarters Road crosses Tinicum Creek in Tinicum Township (the Headquarters Road bridge).

8.      Two stone piers and east and west abutments at the banks of the Creek support the Headquarters Road bridge.

9.      The stone piers and abutments of the Headquarters Road bridge were built in 1812; the deck span was modernized in 1919.

10.     The bridge has been a narrow structure carrying a single lane for travel since its construction in 1812, even after the deck was modernized in 1919.

11.     After the deck deteriorated, in 2011 PennDOT closed the Headquarters Road bridge to vehicular travel.

12.     PennDOT has declared the bridge structurally deficient.

13.     The bank of the Tinicum Creek on the right (western) side (looking downstream from the bridge) is adjacent to a floodplain that is a meadow and pasture approximately 375 feet wide with a forested edge that ranges from twelve to twenty (12-20) feet wide within two hundred (200) feet below the bridge, and increases in range to thirty-five to forty-five (35-45) feet at the downstream edge of the pasture to a point approximately 570 feet below the bridge. The floodplain then transitions to a forested floodplain and extends for another approximately 275 feet.

14.     For more than 200 years, the piers and abutments of the bridge in their existing location have functioned to direct the flow of the Tinicum Creek along the right bank and right riparian buffer in the vicinity of the pasture and meadow.

15.     A riparian buffer is a vegetated area near a stream with trees and other riverine plants that help protect the stream from adjacent land erosion and resultant degradation of water quality.

16.     The right (west) riparian buffer and right stream bank of Tinicum Creek along the pasture and meadow are currently stable.

17.     The right riparian buffer and right stream bank along the pasture and meadow have been relatively stable for at least a century.

18.     The Pennsylvania Department of Transportation (PennDOT) intends to demolish the 1812 piers and abutments, and the 1919 superstructure.

19.     After the demolition, PennDOT intends to construct a new bridge, with two travel lanes, in a design that shifts the location of the left (east) bank abutment from its current location (looking downstream) approximately ten to eleven (10-11) feet westward into the existing Creek channel, and shifts the location of the right (west) bank abutment approximately fifteen (15) feet westward of the existing right abutment.

20.     The new bridge will be supported by a single pier centered on the new westward-shifted alignment instead of being supported on two piers as it is now.

21.     Shifting the left abutment 10-11 feet into the Creek together with the reduction in piers and right abutment lateral shift approximately 15 feet westward will change the location of the hydraulic opening through which the water in the channel of the Creek flows.

22.     Within the floodplain surrounding the 1812 piers and existing abutments are farms, and in particular, at downstream right bank, the pasture/meadow and other fields consisting of alluvial soils which are highly erodible.

23.     Soils with high silt content such as those in the pasture/meadow are the most erodible of all soils, according to the U.S. Department of Agriculture National Resource Conservation Service.

24.     After the lateral shift of the right (west) abutment, the flow of water in Tinicum Creek will be  directed into the right bank and right riparian buffer.

25.     The riparian buffer will destabilize over time and result in increased sediment loading in the active channel of the Creek and erosion extending into the right pasture/meadow.

26.     The erosion of the soils in the right bank and right riparian buffer and pasture/meadow and resultant sediment pollutant load in the active channel will degrade the water quality in Tinicum Creek.

27.     Shifting the right abutment location 15 feet westward will  impair the stability of the right riparian buffer and right stream bank, along the pasture/meadow floodplain.

28.     The erosion of the downstream right bank and riparian buffer is likely to negatively impact the narrow (12-20 feet wide) stand of mature hardwood trees, increase light penetration to the stream, and increase temperature by removing shade.

## THE WILD AND SCENIC RIVERS ACT

29.     The Wild and Scenic Rivers Act (the Act) was enacted by Congress in 1968, 16 U.S.C. 1271 *et. seq.*

30.     Section 7 of the Wild and Scenic Rivers Act provides that "no department or agency of the United States shall assist . . . in the construction of any water resources project that would have a direct and adverse effect on the values for which such river was established, as determined by the secretary charged with its administration." 16 U.S.C. 1278(a).

31.     Section 7 of the Act requires the U.S. Department of the Interior to evaluate whether a water resource project would have a direct and adverse effect on a designated river's values, including water quality.

32.     When a water resources project is found to have a direct and adverse effect on a Wild and Scenic River, the project cannot be authorized or funded absent Congressional intervention.

33.     The National Park Service executes the U.S. Department of Interior's duties under Section 7 of the Wild and Scenic Rivers Act.

**NPS'S DETERMINATION**

34.     The National Park Service (NPS) issued a letter on March 30, 2021, purporting to evaluate whether there would be direct and adverse effects on water quality and the outstandingly remarkable values of Tinicum Creek caused by PennDOT's project.

35.     Remarking on the lateral shift westward, NPS found that "the new hydraulic opening of the bridge [will be] more in line with the current channel geometry of Tinicum Creek." [NPS Evaluation, Letter, March 30, 2021, at p. 2.]

36.     NPS found that, "The shift, however, does expose the western streambank upstream and downstream of the bridge to the potential for increased erosion—particularly downstream, where the western streambank will no longer benefit from the same degree of

'protection' provided by the western bridge abutment." [NPS Evaluation, Letter, March 30, 2021, at pp. 2-3.]

37.     The existing 1812 piers and abutment footings will be completely removed to a depth of at least two feet below the finished streambed elevation or entirely, where feasible, post-construction. See Condition #8, Required Project Measures/Conditions Monitoring.

38.     NPS further stated that, "Some longer-term sediment transport/erosion through the project area (upstream or downstream) may occur in conjunction with the replacement structure, as the stream channel adjusts to the new bridge configuration. The extent to which this could become problematic or excessive with respect to stream channel stability, erosion and sedimentation has been the subject of substantial discussion among PennDOT, PA DEP, and the US Army Corps of Engineers through the permit review process." [NPS Evaluation Letter, March 30, 2021, at p. 3.]

39.     The record does not make clear how these substantial discussions resolved, or did not resolve, the potential for direct and adverse effects on water quality and the outstandingly remarkable values for which the Tinicum Creek was designated as a Wild and Scenic River.

40.     NPS did not conduct an analysis of the effects on water quality of the lateral shift of the right abutment approximately 15 feet westward, on the upstream and downstream right banks and riparian buffer, including erosion and sediment pollutant load.

41.     NPS did not conduct an analysis of the effects of shifting the alignment of the left abutment 10-11 feet into the Creek channel and right abutment approximately 15 feet westward, on the outstandingly remarkable values for which this Creek was designated part of the Lower Delaware River Wild and Scenic River system.

42.     NPS did not conduct an analysis of the right (west) bank and right riparian buffer stability according to Bank Erosion Hazard Index,  the number of trees and plants expected to be lost in the riparian buffer zone on the right bank downstream, or any other criteria.

43.     NPS did not conduct an analysis of the angle of attack of the flow of water under the new alignment (which cannot be determined using the model employed by PennDOT for such impacts).

44.     NPS did not determine whether the project was analyzed under PennDOT's anti-degradation policy.

45.     Upon information and belief, NPS asked PennDOT to undertake additional modeling which would have helped identify and define effects of the lateral shift of the alignment of the new bridge, on water quality in Tinicum Creek.

46.     PennDOT claims that the velocity increase in the water flowing through the new hydraulic opening is de minimis.

47.     Velocity of water in the Creek increases as much as three feet per second in a 10-year storm (from as much as 6.5 feet per second to 9.5 feet per second), in post-construction conditions.

48.     Velocities greater than four (4) feet per second are considered the maximum permissible for vegetated, bank will erodible soils, and require measures to be taken to present erosion, according to Chapter 8 of PennDOT's Publication 584 Drainage Manual (2015) Table 8.12.

49.     Site plans prepared for PennDOT which depict the transition of the planned rip rap armoring of the right bank immediately downstream of the new right abutment are inadequate to determine upstream or downstream right bank impacts on water quality or on the Outstanding

Remarkable Values of the Creek, outside of the project limits, or beyond 500 feet upstream and downstream of the proposed new bridge.

50.     Under the heading "Monitoring," NPS then stated in its Evaluation Letter, "The proposed project represents a compromise design, balancing issues including public safety, free-flowing condition, historical character, and other pertinent factors." [NPS Evaluation Letter, March 30, 2021, at p. 3.]

51.     NPS's purview under the Wild and Scenic Rivers Act, Section 7, does not include assessing public safety,[1] nor PennDOT's stated purpose and need for the project.

52.     It is not clear what "other pertinent factors" NPS considered in reaching its decision that there would be no direct and adverse effects on water quality and the ORVs of Tinicum Creek as a result of removal of the right (west) abutment and lateral shift of the bridge alignment and new right abutment because the "other pertinent factors" are not identified in NPS's March 30, 2021 Evaluation Letter.

53.     Continuing, NPS stated, "As such, NPS believes uncertainties remain regarding the potential of unanticipated adverse erosion or stream channel stability issues which relate to the 'free-flowing character' of the Wild and Scenic River segment. [NPS Evaluation Letter, March 30, 2021, at p. 3.]

---

[1]Public safety may relate to accommodating the turning movement of a long fire truck, purchased by the Ottsville Volunteer Fire Company, which has turning radius issues. PennDOT is replacing the existing bridge with a two-travel lane bridge. Two-thirds of all bridges in Tinicum Township maintained by PennDOT (14 of 27) are one-lane bridges, appropriate to the rural nature of the area, as are twelve (12) of fourteen (14) bridges maintained by Tinicum Township, and six (6) of nine (9) bridges maintained by Bucks County.

54.     NPS continued, "These uncertainties warrant monitoring of the project area above and below the bridge during and after construction." [NPS Evaluation Letter, March 30, 2021, at p. 3.]

55.     NPS continued, "To that end, NPS, PennDOT, PA DEP and the US Army Corps of Engineers have collaborated on the development of a monitoring protocol (attached). This monitoring protocol will ensure that stream channel conditions associated with project during and post-construction are monitored and reported, and that all four parties will meet on an annual basis to review and evaluate the findings." Id. at p. 3.

56.      In its consideration of the project, NPS must make its determination whether Section 7 of the Wild and Scenic Rivers Act is satisfied based on the project's effects on water quality and the outstandingly remarkable values for which the Tinicum Creek was designated as a Wild and Scenic River.

57.     NPS's determination of direct and adverse effects *vel non* must be made prior to the undertaking, not afterward, based on post-construction monitoring of the streambank conditions.

58.     The monitoring protocol does not include monitoring water quality in Tinicum Creek.

59.     NPS then concluded that the demolition of the 1812 piers and abutments and shift in alignment of the new pier and abutments "would not have a 'direct and adverse' effect on the Lower Delaware Wild and Scenic River's free-flowing condition, water quality or outstandingly remarkable values, provided that the project is constructed consistent with the PennDOT SR-1012-BRC-E85 Plans 071620 and SR-1012-BRC- Site Plans 071720 and that avoidance and minimization measures and actions cited below are fully and properly fulfilled for the duration of

the Project along with the implementation of the above-referenced monitoring protocol." [NPS Evaluation Letter, March 30, 2021, at p. 3.]

60.     Avoidance and minimization measures are undertaken during demolition and construction; these are typical erosion and sedimentation control measures such as requiring straw bales and biodegradable matting during construction (conditions #1 and #2), and requiring compliance with similar best practice measures pursuant to PennDOT's Sediment Pollution Control Program Manual Final Technical Guidance Number 363-2134-008 (March 2012) (condition # 6). See Conditions # 1- # 12 within NPS Evaluation Letter dated March 30, 2021.

61.     Avoidance and minimization measures undertaken during demolition and construction do not address the "uncertainties [that remained in NPS's view] regarding the potential of unanticipated adverse erosion or stream channel stability issues" of the project post-construction.

62.     The monitoring protocol to which NPS referred, and essentially deferred, in its March 30, 2021 Evaluation Letter is titled, "Headquarters Rd. Bridge Monitoring Requirement, December 2020." (Monitoring Protocol)

63.     According to the Monitoring Protocol, PennDOT must "monitor" for "severe erosion" by making observations and taking photographs of the streambank stability conditions along the western bank of the stream, for the first 180 feet immediately upstream and downstream of the new bridge. [Monitoring Protocol, December 2020, at p. 1.]

64.     Specifically, the Monitoring Protocol requires PennDOT to photograph the stream bank every three months after the new bridge is opened and after 10-year or greater storms, for one year, and if severe erosion is not "noted," every six months and after 10-year storms, for two additional years.

65.        "Severe erosion" is not defined in the monitoring protocol and is not a term of art.

66.        There is no objective metric in the post-construction monitoring protocol by which PennDOT or NPS may judge whether "severe erosion" occurs.

67.        There is no objective metric in the post-construction monitoring protocol regarding NPS's determination of direct and adverse effects on water quality in Tinicum Creek.

68.        There is no objective metric in the post-construction monitoring protocol regarding NPS's determination of effects on any ORVs that qualified Tinicum Creek as a Wild and Scenic River.

69.        If severe erosion occurs post-construction, the monitoring protocol also has no procedure for correction or mitigation of the effects on water quality or ORVs.  The monitoring protocol merely states that, "The Corps, PADEP, National Park Service and PADOT agree to have annual monitoring meetings to review and discuss the findings of the reports." [Monitoring Protocol, December 2020, at p. 2, #5.]

70.        NPS may not defer to PennDOT as to whether severe erosion occurs based on post-construction monitoring, in making NPS's Section 7 determination about the project's effects under the Wild and Scenic Rivers Act.

71.        As written, the monitoring protocol, even if it were lawful for NPS to substitute it for a pre-undertaking Section 7 decision, is ineffective, and therefore reliance on the monitoring protocol is arbitrary and capricious, and not in accordance with law.


**THE PARTIES**

72.        Plaintiffs are Delaware Riverkeeper Network, and the Delaware Riverkeeper, Maya van Rossum (Plaintiffs).

73.     Plaintiff Delaware Riverkeeper Network is a Pennsylvania non-profit organization with its principal place of business at 925 Canal Street, 7th Floor, Suite 3701, Bristol, Pennsylvania.

74.     Delaware Riverkeeper Network was established in 1988 and has more than 25,000 members.  DRN's mission is to protect and restore the Delaware River, and its tributaries, habitats and resources.

75.     The Delaware Riverkeeper, Maya van Rossum, is the executive director of the Delaware Riverkeeper Network. The Delaware Riverkeeper also functions as an ombudsman for the Delaware River and its tributaries and watershed.  See e.g., Delaware Riverkeeper Network v. Pennsylvania DEP, 2018 WL3554639 (Cmwlth. Ct. Pa. July 25, 2018), at pp. 5-6 (three parties had standing and capacity to sue, including the Riverkeeper as an ombudsman, and DRN as a member organization).

76.     Defendant National Park Service (NPS) is an agency within the U.S. Department of the Interior with its principal place of business at Washington, DC.

77.     The NPS was created in 1916 when Congress enacted the National Park Service Organic Act of 1916, 16 U.S.C. §§ 1-18f-3 *et seq*.

78.     The NPS's jurisdiction includes determining whether a project is a federally assisted water resources project that falls within Section 7 of the Wild and Scenic Rivers Act, 16 U.S.C. 1271, *et seq.*, and whether the project, if covered, has a direct and adverse effect on water quality and the values for which designated rivers were established as part of the Wild and Scenic Rivers system.

## JURISDICTION AND VENUE

79.     This Court has subject matter jurisdiction over this action under 28 U.S. C. § 1331

(federal question) and 5 U.S.C. § 702 (right of review of agency action) because the action of the

National Park Service challenged here arises under the laws of the United States, based on the

violation of Section 7 of the Wild and Scenic River Act, 16 U.S.C. 1278(a).

80.     The Court may grant legal, declaratory and injunctive relief pursuant to 28 U.S.C.

§§ 2201-2202.

81.     This action for declaratory judgment is filed pursuant to 5 U.S.C. § 706.

82.     Plaintiffs allege that the NPS's determination under Section 7 that the removal of

the right abutment and lateral shift 15 feet westward will not have a direct and adverse effect on

water quality or on the values for which Tinicum Creek was designated Wild and Scenic was

arbitrary, capricious, and an abuse of discretion or otherwise not in accordance with law, because,

*inter alia,* the determination is not supported by facts in the record before NPS when it made the

determination of no effects, and is contradicted by NPS's own stated uncertainties about the

potential effects.

83.     The NPS's errors giving rise to the Complaint will manifest in degraded water

quality, erosion of the streambanks upstream and downstream, and designation of Tinicum Creek's

ORV's, in this judicial district if the agency determination under Section 7 of the Act is not

enjoined, reversed, and/or remanded for further consideration.

84.     Venue is proper in this Court pursuant to 28 U.S.C. § 1392(b) because it is the

judicial district in which the Tinicum Creek is located, and in which Plaintiff has its principal place

of business.

**STANDING**

85.     To achieve its goals, Delaware Riverkeeper Network (DRN) implements stream bank restorations, a volunteer monitoring program, educational programs, environmental initiatives, recreational activities, and environmental law enforcement efforts throughout the entire Delaware River watershed – an area which includes portions of Pennsylvania, New York, New Jersey and Delaware, and specifically includes Tinicum Creek and its surrounding lands.

86.     DRN members include individuals concerned about the protection and restoration of the Delaware River, and its tributaries, habitats and resources.  DRN's members are dedicated to preserving and improving the cultural, historic and environmental resources of the Delaware River watershed.

87.     DRN has had a pivotal role in obtaining Special Protection Waters status for the Upper and Middle Delaware Wild and Scenic River segments by petitioning the Delaware River Basin Commission in 1992.

88.     DRN petitioned to classify the Lower Delaware as Special Protection status, in July 2008.  DRN played a significant role in advancing and securing the Wild and Scenic status of the lower Delaware River, including the Tinicum Creek.

89.     Maya van Rossum, in her role as the Delaware Riverkeeper, testified before Congress in support of the Wild and Scenic designation of Tinicum Creek.

90.     DRN's thousands of members, and Maya van Rossum, all enjoy the water quality and bucolic surroundings of the Delaware River.

91.     DRN members fish, canoe, bird, hike and participate in other recreational activities throughout the watershed, including the areas near and immediately surrounding the 1812 piers and abutments supporting the Headquarters Road bridge over Tinicum Creek.

92.     DRN's members will be adversely affected and harmed by the changes to water quality, velocity and magnitude of the flow of the Creek, and in particular the degradation of the bank and riparian buffer and the adjacent fields, which constitute the floodplains, that will be eroded resulting in sediment pollution in the Creek, after the abutments are demolished and shifted westward.

93.     Downstream properties including those owned by DRN members will be adversely affected by changed flow velocity, direction, channel location and erosion.

94.     DRN, DRN's members, and the Delaware Riverkeeper, Maya van Rossum, will be adversely affected and harmed by the loss of the right existing abutment and lateral shift of the new right abutment westward, which help maintain the regulatory protections applicable to the resources of the Tinicum Creek, the riparian buffer, floodplain, and the lower Delaware River.

95.     The laws of Pennsylvania and DRN's articles of incorporation, bylaws, and Board of Directors authorize it to bring this action on behalf of itself and its members.

96.     Plaintiff the Delaware Riverkeeper, Maya van Rossum, is a full-time privately funded ombudsman responsible for the protection and restoration of the waterways in the Delaware River Watershed, including the cultural, historical, ecological, recreational, commercial and aesthetic qualities of the Delaware River and its tributaries, habitats and resources.

97.     Maya van Rossum regularly visits the Delaware River for personal and professional reasons, and her use and enjoyment of the River and the Tinicum Creek area will be significantly diminished by the demolition of the bridge and abutment, and by the impacts to Tinicum Creek, and areas downstream resulting from the demolition.

98.     Personally and professionally, the Delaware Riverkeeper, Maya van Rossum, is a regular visitor to Tinicum Township, the Tinicum Creek, and locations at and around the proposed

Bridge site that would be adversely affected by the final actions taken.  Her use, enjoyment, and appreciation of the Creek and the Tinicum community will be harmed, reduced and degraded by the replacement of the Bridge and resulting environmental impacts.

## COUNT I

**NPS'S DETERMINATION THAT REMOVAL OF THE EXISTING RIGHT ABUTMENT AND WESTWARD ALIGNMENT SHIFT OF THE NEW ABUTMENT WILL NOT HAVE DIRECT AND ADVERSE EFFECTS ON THE CREEK'S WATER QUALITY AND ORVS IS ARBITRARY, CAPRICIOUS AND NOT IN ACCORDANCE WITH LAW**

99.      Plaintiffs incorporate, as if fully repeated herein, all of the foregoing statements and averments in this Complaint.

100.      The NPS recited in its Section 7 Evaluation Letter that, "NPS believes uncertainties remain regarding the potential of unanticipated adverse erosion or stream channel stability issues which relate to the 'free flowing character' of the Wild and Scenic River Segment [of the Tinicum Creek]."  [NPS Evaluation Letter, at p. 3.]

101.      The reason those uncertainties remain is that, according to the NPS's evaluation, "Some longer-term sediment transport/erosion through the project area (upstream or downstream) may occur in conjunction with the replacement structure, as the stream channel adjusts to the new bridge configuration." [Id., at p. 3.]

102.      The NPS further explained that, "The extent to which this [longer-term sediment transport/erosion upstream and downstream] could become problematic or excessive with respect to stream channel stability, erosion and sedimentation has been the subject of substantial discussion among PennDOT, PA DEP, and the US Army Corps of Engineers through the permit process." [Id., at p. 3.]

103.     NPS was not persuaded that the sediment transport and erosion upstream and/or downstream will not occur and "become problematic or excessive" and pointed to no facts in the record that assisted NPS to resolve its uncertainties that remain regarding adverse erosion or stream channel stability issues.

104.     Because NPS did not resolve the uncertainties relating to potential effects on water quality from erosion, or negative effects on the ORVs that characterize Tinicum Creek, NPS did not have a factual basis in the record for its determination that there would be no direct and adverse effect on water quality and ORVs in the lower Delaware River and Tinicum Creek.

105.     NPS is required in its Section 7 evaluation to establish, based on facts in the record, that direct and adverse effects will actually be avoided, i.e., that they will not occur. If they will occur, or if NPS does not know whether they will occur, NPS cannot lawfully approve the project under Section 7 of the Wild and Scenic Rivers Act.

106.     NPS violated Section 7 of the Wild and Scenic River Act in its March 30, 2021 determination; its decision was arbitrary, capricious and not in accordance with law.

## COUNT II

### NPS'S RELIANCE ON A STATE AGENCY'S CONSTRUCTION-RELATED EROSION AND SEDIMENT CONTROL MEASURES IN MAKING NPS'S OWN SECTION 7 DETERMINATION WAS ARBITRARY, CAPRICIOUS AND NOT IN ACCORDANCE WITH LAW

107.     Plaintiffs incorporate, as if fully repeated herein, all of the foregoing statements and averments in this Complaint.

108.     The NPS statement that "[t]hese uncertainties warrant monitoring of the project above and below the bridge during and after construction" demonstrates that the NPS did not actually determine, based on facts in the record before it, that there will be no direct and adverse

effects (unanticipated adverse erosion or stream channel stability issues) on water quality upstream and downstream and on Tinicum Creek's ORVs from the lateral shift westward of the bridge support system.

109.     NPS continued, "Toward that end NPS, PennDOT, Pennsylvania Department of Environmental Protection and the US Army Corps of Engineers have collaborated on the development of monitoring protocol (attached)."  [NPS Evaluation Letter at p.3.]

110.     NPS then concluded that the removal of the right abutment and lateral alignment shift, would not have a "direct and adverse effect" water quality OVRs, however, that unsupported conclusion was conditioned: "provided that the project is constructed consistent with the PennDOT SR-1012-BRC E & S Plans 071620 and SR-1012-BRC-Site Plans 071720, and that avoidance and minimization measures and actions cited below [in the March 30, 2021 NPS Evaluation Letter] are fully and properly fulfilled for the duration of the Project along with the implementation of the above-referenced monitoring protocol [.]" [NPS Evaluation Letter, at p. 3.]

111.     The E & S [Erosion & Sedimentation Control] Plans and Site Plans are based on a computer model called HEC-RAS 1 [Hydrological Engineering Center – River Analysis System] that is a one-dimensional program that models hydraulic flow through a channel at different cross-sections of the river for 500 feet upstream and downstream of a location, in this case, the planned new bridge and its support system.

112.     The HEC-RAS one-dimensional model does not predict where the water flows to, and other flow factors.

113.     The HEC-RAS one-dimensional model output is not specific to determining the effects of the westward lateral shift and removal of the right abutment specifically on the right downstream or upstream bank of the Tinicum Creek.

114.    Erosion upstream and downstream, the effect of which NPS is uncertain, is not resolved by NPS's condition to its conclusion that PennDOT will comply with PennDOT's own E & S avoidance and minimization measures for construction sites, nor compliance with PennDOT's best practices manual.

115.    If Section 7 were satisfied by NPS's relying on a state's transportation or other construction agency's compliance with their own E & S measures and best practice manuals, there would be no need for a Section 7 analysis and decision under the Wild and Scenic Rivers Act as to whether the overall project's effects will result in direct and adverse effects on water quality and ORVs of the designated Wild and Scenic River.

116.    E & S avoidance and minimization measures such as straw bales and biodegradable matting, and E & S manuals which include other best practices to avoid sediment from entering streams at construction sites, even if well-executed, do not predict or  measure the project's actual effects on water quality, upstream and downstream, due to sediment load from erosion, or on ORVs such as recreational, historic, cultural,  geological, characteristics of Tinicum Creek.

117.    The implementation by a contractor hired and supervised by PennDOT of avoidance and minimization techniques for E & S control at a construction site and a Section 7 evaluation and determination of direct and adverse effects *vel non* on water quality and ORVs of a Congressionally-designated Wild and Scenic River segment by the National Park Service are entirely different undertakings, and analyses.

118.    There was no determination by NPS that compliance with such typical construction site E & S measures and a best practice manual (even assuming proper execution) would result in no direct and adverse effects based upon evidence, including science- and

engineering-based data, that the removal of the right abutment and lateral shift of the alignment directing the flow toward the downstream farm field and riparian buffer consisting of erodible soils would not destabilize the bank and buffer and result in long-term sediment pollutant load into the Creek, impairing water quality of Tinicum Creek.

119.    NPS essentially equated compliance with certain E & S control measures and a PennDOT manual with NPS's legal to analyze whether direct and adverse effects on water quality and ORVs would occur.

120.    NPS did not rely upon facts in the record, and did not enunciate any facts in the record, to support its determination that no direct and adverse effects to water quality and ORVs would occur, and in fact, NPS stated its uncertainties; the conditional proviso regarding E & S attached to NPS's unfounded conclusion is ineffective vis-avis NPS's duty and scope under Section 7, and mere surplusage.

121.    The condition NPS imposed regarding E & S compliance is not a lawful substitute for the execution of the NPS's legal duty under Section 7 of the Wild and Scenic Rivers Act to determine, based on facts in the record, that direct and adverse effects will actually be avoided, i.e., will not occur.

122.    NPS's conditioning its determination, factually unfounded and uncertain as it is, on compliance with the PennDOT E & S plans, site plans, manual, and related conditions is also irrelevant, as those conditions would presumably be complied with by PennDOT in any case.

123.    NPS has violated Section 7 of the Wild and Scenic Rivers Act because its decision, including the conditional E & S provision, was arbitrary, capricious and not in accordance with law.

## COUNT III

### NPS'S RELIANCE ON POST-CONSTRUCTION MONITORING IS NOT A SUBSTITUTE FOR A PRE-CONSTRUCTION DETERMINATION UNDER SECTION 7 BASED ON FACTS IN THE RECORD THAT DIRECT AND ADVERSE EFFECTS WILL NOT OCCUR

124.     Plaintiffs incorporate, as if fully repeated herein, all of the foregoing statements and averments in this Complaint.

125.     NPS addressed its uncertainties by improperly relying on post-construction monitoring of the streambanks upstream and downstream of the bridge after it opens, by PennDOT taking photographs at certain reference points upstream and downstream of the bridge, for 180 feet.

126.     NPS stated, "This monitoring protocol will ensure that stream channel conditions associated with [the] project during and post-construction are monitored and reported, and that all four parties [Pennsylvania Department of Environmental Protection, Pennsylvania Department of Transportation, U.S. Army Corps of Engineers, and National Park Service of the Department of the Interior] will meet on an annual basis to review and evaluate the findings."  [NPS Evaluation Letter, at p.3.]

127.     Photographs and follow up narrative reports  do not substitute for a fact-based evaluation prior to the undertaking based on science and engineering and a decision based on those facts.

128.     The monitoring protocol, even if carried out perfectly, will not provide facts or data on which NPS could base a pre-demolition, pre-construction evaluation and determination as required by Section 7, as to the occurrence *vel non* of direct and adverse effects on water quality in Tinicum Creek or the ORVs that characterize Tinicum Creek.

#5467015v1                                                                                                           21

129.     Specifically, the monitoring conditions provide that: "[p]hotos taken and observations of [stream bank] conditions will be summarized in a post-construction monitoring report… when the roadway is opened to the public. After this, photos will be taken every 3 months and after 10-year or greater storm events. The bridge will be set up in PennDOT's Bridge Watch program to alert the District if a 10-year or greater event occurs at the bridge site. … If severe erosion is not noted, and with written approval from the US Army Corps office in consultation with the PADEP and National Park Service, the monitoring reports will then be submitted every 6 months and after 10-year storm events for the remaining [two] years of observation."

130.     "Severe erosion" is not defined in the monitoring protocol.

131.     "Severe erosion is not a term of art in the engineering discipline of river hydro morphology.

132.     The monitoring protocol provides that "Monitoring Reports shall consist of a brief written report of observed bank conditions to accompany the photographs. The written report shall relate observed conditions to conditions documented prior to and immediately after construction."

133.     The monitoring protocol includes no metric, measure, or guidepost as to what constitutes "severe erosion," nor does it relate that that event, should it occur, to water quality or ORVs.

134.     No objective data about sediment pollutant load at the upstream or erosion downstream right bank, beyond 180 feet, or other effects on water quality in the Creek  or ORVs will be apparent from the photographs and reports.

135.     A monitoring protocol based on photographs, without any measure, metric or guidepost for identifying, defining, calculating or correcting "severe" erosion, is itself subjective and imprecise.

136.     The monitoring protocol does not provide a valid or reliable methodology for the evaluation of effects on the project's effects on the Creek's  water quality or OVRS.

137.     The NPS's employment of a post-construction monitoring protocol for a short distance upstream and downstream of the project as a substitute for, or as a condition to, a fact-based evaluation and determination by the NPS <u>before</u> the project is constructed about the effects <u>of</u> the project <u>after</u> construction, was arbitrary, capricious and not in accordance with law and violated NPS's legal duty under Section 7 of the Wild and Scenic Rivers Act.

138.     The monitoring protocol and avoidance and minimization measures are inadequate and insufficient to form the basis of a pre-undertaking Section 7 evaluation of the project as to whether it will have a direct and adverse effect on water quality and the values for which the Creek was designated as a Wild and Scenic River.

139.     The post-construction monitoring protocol is legally useless and irrelevant to a Section 7 pre-construction evaluation and determination of direct and adverse effects which should be based on facts in the record before the agency.

140.     Moreover, the monitoring protocol is ineffective post-construction as well, because no provision is made in the monitoring protocol for any agency action based upon a finding of "severe erosion."

141.     The monitoring condition only provides that, "The Corps, PADEP, National Park Service and PADOT agree to have annual monitoring meetings to review and discuss the findings of the reports."

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs request from this Court:

A. A declaratory judgment pursuant to 28 U.S.C. §§2201-2202 that the National Park Service's evaluation letter dated March 30, 2021 and determination stated therein that there would be no direct and adverse effect on the water quality and outstandingly remarkable values of the Tinicum Creek  was arbitrary, capricious, and otherwise not in accordance with law;

B. A declaratory judgment pursuant to 28 U.S.C. §§2201-2202 that the NPS violated Section 7 of the Wild and Scenic Rivers Act because its decision that no direct and adverse effects would occur was not based on facts in the record before the NPS and NPS expressed uncertainties about the potential such effects would occur in its determination;

C. A declaratory judgment pursuant to 28 U.S.C. §§2201-2202 that NPS's reliance on a post-construction monitoring protocol that consists of photographing conditions along the streambanks for 180 feet upstream and downstream is not a satisfactory substitute for a decision under Section 7 assessing whether direct and adverse effects will occur prior to the demolition and construction of the project, and that such reliance on the post-construction monitoring protocol was arbitrary, capricious and not in accordance with law;

D. A declaratory judgment pursuant to 28 U.S.C. §§2201-2202 that NPS's evaluation of the "compromise design" advanced by PennDOT included factors beyond NPS's jurisdiction such as public safety "and other pertinent factors," and for that reason was arbitrary, capricious and not in accordance with law;

E.  A declaratory judgment pursuant to 28 U.S.C. §§2201-2202 that NPS's obligation under the Act to assess whether Section 7 will be satisfied or will be violated with respect to direct and adverse effects is not satisfied by PennDOT's compliance with PennDOT's own E & S plan, site plans, or E & S manual and other avoidance and minimizations techniques during construction, and that the post-construction monitoring condition like the E & S practices, provides no objective metrics or measures against which water quality and the outstandingly remarkable values for which the Creek was designated as a Wild and Scenic River may be assessed post-construction, and that NPS's reliance on both was arbitrary, capricious and not in accordance with law;

F.  An Order requiring NPS to re-evaluate the demolition of the piers and abutments of the existing structure and westward shift of the alignment of the new structure under Section 7 of the Wild and Scenic Rivers Act, based on facts in the record, and based on factors within the purview of the NPS under the Act.

G.  An Order awarding Plaintiffs reasonable attorneys fees and expert witness fees and costs of suit including interest pursuant to all applicable federal law(s).

H.  An Order awarding Plaintiffs any other relief this Court deems appropriate, just and reasonable.

**CERTIFICATION PURSUANT TO L. CIV. R. 11.2**

I certify that the matter in controversy is not the subject of any other action pending or contemplated.  A prior action against PennDOT and the Federal Highway Administration under different statutes was decided on August 20, 2002 (Docket No. 18-4508).  PennDOT has not received all of its permits and approvals for the project described herein; if it does receive such

permits or approvals, they may be the subject of further suits.  I further certify that I am aware of no other parties who should be joined in this matter at this time.

## DESIGNATION OF TRIAL COUNSEL

PLEASE TAKE NOTICE that attorney, Janine G. Bauer, is hereby designated as trial counsel in the above captioned litigation for the firm of SZAFERMAN, LAKIND, BLUMSTEIN & BLADER, P.C.

Respectfully submitted,

SZAFERMAN LAKIND BLUMSTEIN & BLADER, P.C.

_/s/ Janine G. Bauer_____
Janine G. Bauer (Pa. Bar No. 41872)
Attorney for Plaintiffs

Dated: June 24, 2021

## VERIFICATION PURSUANT TO 28 U.S.C. §1746

I, Maya van Rossum, declare and verify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on June 24, 2021

_s/ Maya van Rossum_____
Maya van Rossum,
Executive Director of the Delaware
Riverkeeper Network, and
Delaware Riverkeeper